UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                             :

**SUSAN WILLIAMS**,

                Petitioner,

                               **MEMORANDUM DECISION AND ORDER**

            – against –

                               15-CV-2633 (AMD)

**SABINA KAPLAN**, *Superintendent, Bedford Hills Correctional Facility*,

                Respondent.
-------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

        The petitioner, currently incarcerated at Bedford Hills Correctional Facility, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petitioner was convicted after a jury trial of conspiracy in the second degree (N.Y. Penal Law § 105.15), and criminal possession of a forged instrument in the second degree (N.Y. Penal Law § 170.25), in connection with her efforts to hire a hitman to kill her estranged husband.  She was sentenced to concurrent prison terms of eight and a third to 25 years for the conspiracy and two and a third to seven years for the forged instrument, as well as $10,000 in fines.  The petitioner argues that the trial court violated due process when it denied the defense's request for a jury instruction on the affirmative defense of entrapment.  (ECF No. 1 at ¶¶ 38-58.)  For the reasons that follow, the petition is denied.

# FACTUAL BACKGROUND[1]

## I.   Overview

In May 2008, the petitioner forged a change of ownership document to make herself the owner of her husband's life insurance policy, and to make her and her father the beneficiaries. Then, beginning in February 2010, the petitioner made arrangements to hire a hitman to hurt or kill her husband. Those arrangements included conversations and meetings with Joseph LaBella, a private investigator, and Detective Nicholas Occhino, who, unbeknownst to the petitioner, was an undercover police officer posing as a hitman, and recorded their conversations. The petitioner was subsequently charged with conspiracy in the second degree, criminal solicitation in the second degree, criminal possession of a forged instrument in the second degree, and criminal solicitation in the fourth degree. She went to trial before the Honorable Norman St. George and a jury in November of 2010. The jury convicted the petitioner of conspiracy in the second degree and criminal possession of a forged instrument in the second degree.

## II.   Trial

### a.   The Prosecution's Case

The prosecution called eight witnesses at trial and established the following facts:

The petitioner and her husband, Peter Williams, were married on May 27, 1989, and had four children. (ECF No. 6-10 at 334-35.) On January 23, 2008, the petitioner filed for divorce. (*Id.* at 337.) Later that year, she hired private investigator Joseph LaBella, a former NYPD detective, to "dig up dirt on her husband." (ECF No. 6-11 at 22-24, 211.) On May 10, 2008, the petitioner called LaBella and reported that her husband had been drinking at their home, and was

---

[1] Because the petitioner was convicted, the facts are summarized in the light most favorable to the verdict. *See Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012). The facts are drawn from the full record of the state court proceeding.

2

now driving to a friend's home. (*Id.* at 25-26.) LaBella followed Williams, forced him to stop, and called the police, who then arrested Williams for driving under the influence. (*Id.* at 140-41; ECF No. 6-10 at 341-42.) Williams assumed that the petitioner had planned this "setup," and moved out of their family home that month.[2] (ECF No. 6-10 at 341-42.) LaBella continued to follow Williams until the petitioner instructed him to stop in November of 2008. (ECF No. 6-11 at 28.)

On May 19, 2008, Aviva Life Insurance received a change of ownership form—on which the petitioner had forged Williams's signature—that transferred ownership of the policy from Peter Williams to the petitioner.[3] (ECF No. 6-10 at 265-69, 344-45.) Shortly after, Aviva received a change of beneficiary form that changed the contingent beneficiary to Brendan J. Galligan, the petitioner's father. (*Id*. at 261, 274-78.) The petitioner stopped paying the premiums around November of 2009, and, as a result, the policy was due to expire around April of 2010.[4] (*Id.* at 283.)

A "grounds trial" in the petitioner's divorce proceeding was scheduled for sometime in 2010. (ECF No. 6-10 at 337-38.) On February 19, 2010, the petitioner met LaBella at a Nassau County diner. (ECF No. 6-11 at 29-30.) She was "extremely upset" and "angry" that the divorce was not finalized, and stated that "she needed her problem to disappear or for him to disappear."

---

[2] The petitioner was diagnosed with cancer in May of 2008. (ECF No. 6-10 at 361.)

[3] Peter Williams purchased the life insurance policy in June 2001 from Aviva; the policy provided that the named beneficiary would be paid $1 million upon his death. (ECF No. 6-10 at 255, 260-61.) Williams named the petitioner the primary beneficiary and his brother Jim Williams the contingent beneficiary. (*Id*. at 260-61.)

[4] On March 9, 2010, Alexis Williams, the petitioner's daughter, retrieved papers, including the change of ownership form, from their family home. (ECF No. 6-10 at 346-348.) Peter Williams demanded that the petitioner's father return the documents, which the father did. (*Id.* at 349.) Williams saw the change of ownership form and realized that the petitioner had changed the ownership of the policy. (*Id.* at 349-50, 354.)

3

(*Id.* at 30.) She said that her husband had a "very large insurance policy," and asked if LaBella or someone else "could drive a car at a high rate of speed" into him or "beat [him] up." (*Id.* at 30-31.) He asked if she wanted her husband "beat up . . . with a bat" until he was "sipping through a straw." (*Id.* at 31.) When the petitioner suggested "planting narcotics in his car," LaBella replied, "[T]hat really wouldn't make the problem go away." (*Id.*) She then proposed "blowing up the car," and said she would pay someone to hurt her husband. (*Id.*) LaBella advised her that it would cost $10,000 to have her husband beat up and $20,000 to have him killed, and that he would find someone for the job. (*Id.* at 31-32.)

After the meeting, LaBella was "confused, upset," and "very depressed." (*Id.* at 34.) He thought the petitioner could be trying to "frame" him (*id.*), and that if he refused to help her, the petitioner would simply find someone else to hurt or kill her husband (*id.* at 217). On February 23, 2010, he reported his meeting with the petitioner to Detective Nicholas Occhino of the Nassau County Police Department. (*Id.* at 34-35, 265.) That same day, LaBella made a recorded "controlled call" to the petitioner to determine whether she wanted to go ahead with the plan. (*Id.* at 35-36, 265-66.) He asked if she was "still comfortable with everything," and whether she "still want[ed] to move forward." (ECF No. 1 at 23.) The petitioner responded, "Yeah." (*Id.*) LaBella described "Option A and Option B"—"hurting him" versus "making him disappear," reminded her that there was "no turning back now," and said that he would set up a meeting with "a friend." (ECF No. 6-11 at 39; ECF No. 1 at 23-24.) On February 25, 2010, LaBella met with Occhino, and placed another controlled call to the petitioner to schedule a meeting at the same diner; he assured her his "friend" would "take the reigns [sic] over" but that he would "be behind the scenes." (ECF No. 1 at 26.) He asked if she was "still okay with this," and she confirmed she was. (*Id.*)

4

On February 28, 2010, the petitioner, LaBella and Occhino met at Occhino's car, which was parked in a parking lot near the diner; Occhino had audio and video recording equipment in his car and recorded the meeting. (ECF No. 6-11 at 43-45, 271-72.) LaBella introduced Occhino as a "hitman" and left; he had no further contact with the petitioner. (*Id.* at 45, 269.)

The petitioner told Occhino that she was going through a "nasty divorce," and complained at length about her husband. (ECF No. 1 at 30-32.) She called her husband a "nightmare," an "outright liar," and "abusive," and said, "[H]im and his attorney are totally trying to destroy me in every single way." (*Id.*) The petitioner explained that she had "life insurance policies on" Williams, and that she "would love for the . . . money to be given to [her] children." (*Id.* at 33.) When Occhino asked what she needed, she answered that she wanted her husband hurt, because she could not afford more. (*Id.* at 35-37.) She went on to say that she wanted her husband "sippin[g] out of a straw," but that "if in an accident" he "ends up . . . dead," she would feel "great." (*Id.* at 38-39.)

Occhino could not guarantee that her husband would stop "bother[ing]" her if he was "hurt bad," and said that if a person was "dead . . . they're not walking the earth anymore . . . it's forever." (*Id.* at 45, 47.) The petitioner replied, "I'd love that." (*Id.* at 47.) The petitioner considered her financial situation, and settled on hurting her husband "so bad that he can't even fight the divorce anymore;" Occhino agreed to do the job for $10,000. (*Id.* at 54-55.) They agreed to meet again soon so the petitioner could give him a $500 down payment and a picture of her husband. (*Id.* at 58.) Occhino asked multiple times throughout their conversation whether the petitioner was certain that she wanted to go through with the hit; she confirmed that she did. (*See, e.g., id.* at 36, 39, 59.)

5

On March 2, 2010, Occhino called the petitioner, and set up a meeting for the next day. (ECF No. 6-11 at 277-78.) They met in a park on March 3, 2010, and spoke in Occhino's car—this meeting was also recorded by audio and video. (*Id.* at 281-82.) The petitioner said that she had been "going back and forth" about the plot, and that if her husband was merely "hurt," her "kids" would "feel bad for" him, and "[h]e's not going anywhere and nothing really happens." (ECF No. 1 63-64.) Occhino reminded her several times that she could "walk away" and change her mind, and she assured him she understood. (*Id.* at 68-70.) Ultimately, the petitioner said that she wanted her husband "more than hurt." (*Id.* at 70.) Occhino asked if she wanted him "dead," noting there was a "big difference." (*Id.* at 70-71.) The petitioner confirmed, "Yes, that's what I want." (*Id.* at 71.) She said that her husband was "scum," and that she was "not gonna feel bad" about his death: "[I]f I could do it myself, I would."[5] (*Id.* at 72, 79.) The petitioner gave Occhino five one-hundred-dollar bills and a photograph of Williams, with his personal information on the back of the photograph. (*Id.* at 84; ECF No. 6-11 at 288, 291.) On March 4, 2010, the petitioner was arrested for conspiracy to commit murder. (ECF No. 6-11 at 291.)

After the arrest, detectives executed a search warrant authorizing the seizure and search of electronic devices from the petitioner's house. (*Id.* at 230.) The detectives recovered a laptop (*id.*); a forensic examination of the laptop revealed the following text: "Austrian police arrest American woman sought in connection with killing of her ex-husband who died when a bomb exploded in his car more than a decade ago" (*id.* at 243).

b. **The Defense Case**

The defense did not call any witnesses.

---

[5] During this meeting, the petitioner also mentioned "there's a life insurance" policy on her husband for which she paid. (ECF No. 1 at 73.)

6

### c. Jury Instructions and Verdict

In a written request to charge, defense counsel asked Judge St. George to instruct the jury on the affirmative defense of entrapment. (ECF No. 1 at ¶ 25.) Judge St. George denied the application, and counsel objected.[6] (ECF No. 6-11 at 442-43, 528.) Judge St. George charged the jury on the elements of conspiracy in the second degree, criminal solicitation in the second degree, criminal solicitation in the fourth degree, and criminal possession of a forged instrument in the second degree.[7] (*Id.* at 514-526.)

The jury convicted the petitioner of conspiracy in the second degree, and criminal possession of a forged instrument in the second degree.[8] (*Id.* at 553-54.) The court denied the defense motion to set aside the verdict as against the weight of the evidence. (*Id.* at 557-58.)

### d. Sentence

On December 17, 2010, Judge St. George sentenced the petitioner to an indeterminate prison term of eight and a third to 25 years for conspiracy in the second degree, and a concurrent term of two and a third to seven years for criminal possession of a forged instrument, as well as a $10,000 fine.[9] (ECF No. 6-8 at 18-19.)

---

[6] New York Penal Law § 40.05 reads: "In any prosecution for an offense, it is an affirmative defense that the defendant engaged in the proscribed conduct because he was induced or encouraged to do so by a public servant, or by a person acting in cooperation with a public servant, seeking to obtain evidence against him for purpose of criminal prosecution, and when the methods used to obtain such evidence were such as to create a substantial risk that the offense would be committed by a person not otherwise disposed to commit it. Inducement or encouragement to commit an offense means active inducement or encouragement. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment."

[7] The court instructed the jurors that they should consider criminal solicitation in the second degree only if they found the petitioner not guilty of conspiracy in the second degree. (ECF No. 6-11 at 517.)

[8] The jury found the petitioner not guilty of criminal solicitation in the fourth degree. (ECF No. 6-11 at 553.)

[9] The court also issued a permanent order of protection, which directed the petitioner to stay away from Peter Williams. (ECF No. 6-8 at 19-21.)

## PROCEDURAL HISTORY

### I. Direct Appeal

The petitioner, represented by counsel, appealed her conviction to the Appellate Division, Second Department. (ECF No. 6-1.) She argued that the trial court should have instructed the jury on entrapment, and that her sentence was excessive. (*Id.* at 11, 16.)

On October 23, 2013, the Appellate Division unanimously affirmed the petitioner's conviction, *People v. Williams*, 110 A.D.3d 1017 (2d Dep't 2013), concluding that the trial court "properly declined the defendant's request to charge the jury with the affirmative defense of entrapment since no reasonable view of the evidence supported that defense." *Id.* at 1017. The court also found that the sentence was not excessive. *Id.* at 1018. On February 18, 2014, the Court of Appeals denied the petitioner's application for leave to appeal. *People v. Williams*, 22 N.Y.3d 1142 (2014).

### II. Habeas Petition

On May 7, 2015, the petitioner filed this petition, in which she claims that the trial court's refusal to charge the jury on entrapment violated due process. (ECF No. 1 at 12.) For the reasons that follow, the petition for a writ of habeas corpus is denied.

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits. 28 U.S.C. § 2254(a). A federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also*

*Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id*. at 412-13. The court reviews the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Moreover, a federal court must not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). This doctrine applies to both substantive and procedural state law grounds. *Id*. at 729-30.

Finally, a habeas petitioner must exhaust state court remedies, so that the state courts have a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court

9

capable of reviewing it" before filing his habeas petition. *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

## DISCUSSION

A federal habeas court undertakes a "three-step analysis for determining whether a state court's refusal to give a specific jury instruction violates federal due process." *Buckner v. Burge*, No. 06-CV-1180, 2010 WL 1328982, at *5 (E.D.N.Y. Mar. 31, 2010). First, the court must determine whether the "petitioner was erroneously deprived of a jury instruction to which he was entitled under state law." *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001). Second, the court "asks whether the failure to give such a charge was sufficiently harmful to make the conviction unfair." *Jackson v. Edwards*, 404 F.3d 612, 621 (2d Cir. 2005) (citing *Davis*, 270 F.3d at 124); *see also Cupp v. Naughten*, 414 U.S. 141, 147 (1973) ("[T]he question is . . . whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."). Third, the court considers whether "the state court's failure [was] of such a nature that it is remediable by habeas corpus, given the limitations prescribed by 28 U.S.C. § 2254." *Davis*, 270 F.3d at 124. The federal court cannot grant relief unless it answers all three questions in the petitioner's favor. *Id.*; *Jackson*, 404 F.3d at 621.

Under New York law, the defendant bears the "burden of establishing entrapment by a preponderance of the evidence," and must demonstrate both that "he was actively induced or encouraged to commit the offense by a public official," and that "such inducement or encouragement created a 'substantial risk' that the offense would be committed by defendant who was not otherwise disposed to commit it." *People v. Brown*, 82 N.Y.2d 869, 871 (1993) (citing N.Y. Penal Law § 25.00 and quoting N.Y. Penal Law § 40.05); *see also Vega v. Walsh*, 258 F. App'x 356, 358 (2d Cir. 2007) ("The defense requires a showing both that the proscribed

10

conduct was induced or encouraged by official activity and that the defendant had no predisposition to engage in such conduct." (quoting *People v. Butts*, 72 N.Y.2d 746, 750–51 (1988)) (internal quotation marks omitted)). A defendant is not entitled to an entrapment charge when "'no reasonable view' of the evidence would allow a jury to find that the statutory requirements of an entrapment affirmative defense were satisfied." *Vega*, 258 F. App'x at 358 (quoting *Brown*, 82 N.Y.2d at 871). The court must review the evidence "in the light most favorable to the defendant." *Brown*, 82 N.Y.2d at 871.

In this case, there was no reasonable view of the evidence that a public servant "actively induced" the petitioner to commit a crime she otherwise would not have committed. The petitioner concedes that Joseph LaBella was a private citizen when she talked to him about doing something to her husband, but claims that "his active encouragement . . . at this initial meeting laid the ground work for his subsequent efforts to ensnare her in the investigation, which commenced a mere three days later." (ECF No. 1 at ¶ 45.) But as the evidence demonstrates, the petitioner was actively seeking to hurt or kill her husband, and neither LaBella nor Detective Occhino induced or encouraged her in this regard.

Indeed, the evidence established that the petitioner began plotting against her husband in early 2008, when she hired LaBella specifically to "dig up dirt" on her husband. (ECF No. 6-11 at 211.) At one point, she set her husband up to get arrested. Next, all on her own, she forged his signature on a form that made her the owner of his life insurance policy, and made her and her father the beneficiaries. Not long before the trial in her divorce case was to begin, she arranged to meet LaBella, told him that she needed her husband to "disappear," and asked if someone could "drive a car at a high rate of speed" into him. (*Id.* at 30-31.) During the first controlled call, LaBella asked early in their conversation whether she was "comfortable" and

"want[ed] to move forward," and the petitioner responded, "Yeah." (ECF No. 1 at 23.) When he reminded her that there was "no turning back now," the petitioner immediately responded, "No, I understand," and continued to discuss setting up a meeting with LaBella's "friend," the hitman. (*Id.* at 23-24.)

It was equally clear that it was the petitioner, not Detective Occhino, who decided that she wanted her husband killed. Her only hesitation had been the price;[10] she ultimately decided that if her husband was merely "hurt," her children would "feel bad" for him. (*Id.* at 64.) Occhino repeatedly stressed that the choice was hers and hers alone. He told her that he was not "here to put thoughts in your head" or "words in your mouth" (*id.* at 33), and that she had to be "one hundred percent sure" about her choice, because "it can't be taken back . . . it's not TV" (*id.* at 39, 47). He also emphasized that he did not "care either way. You could, Susan, you wanna walk away from me, we never met, have a good life, see you later, that's fine. I don't give a rat's ass." (*Id.* at 68.) The petitioner responded that she would "love . . . to just do this . . . and get it done," and "if it's an accident I'd love it." (*Id*. at 68-70.) And she said, "[I]f I could do it myself, I would." (*Id.* at 79.) She also provided Occhino with the means for locating her husband, including a photograph with his personal information. *See People v. Smyth*, 233 A.D.2d 746, 747 (3d Dep't 1996) ("There is also ample record evidence that defendant was predisposed to commit the crime when he met with the undercover investigator on October 15, 1992. He drove out to a rest stop on an interstate highway, equipped with a photograph of his

---

[10] She explained that she decided to have the hitman hurt her husband instead of killing him because of "prices" and what she could "afford." (*Id.* at 35, 37.) Occhino acknowledged that he could not guarantee her husband would not "bother" her if he was hurt, and commented that once someone was "dead . . . it's forever." (*Id.* at 45, 47.) The petitioner responded, "I'd love that . . . but . . . I know what it costs . . . and I don't have it." (*Id.* at 47.)

12

wife, and also provided information to the investigator to assist him in locating defendant's wife and killing her.").

Even selecting "the proof which best supports [the petitioner's] position, there would still be no rational basis on this record for the entrapment charge." *Butts*, 72 N.Y.2d at 751. *People v. Sundholm*, 58 A.D.2d 224 (4th Dep't 1977), which the petitioner cites, is a far different case. There, the cooperating witness repeatedly asked Sundholm to sell him drugs, before any police involvement. The court found that the cooperator's conduct "set the stage and could be found to have conditioned defendant to be more susceptible to police entrapment." *Id.* at 228. There is no such evidence in this case. When LaBella spoke to the petitioner on February 19, he merely responded to what she was saying. *See Smyth*, 233 A.D.2d at 747 (finding that certain conversations between a cooperator and the defendant did not constitute proof of inducement because they took place before the cooperator became an agent of the police, and because the cooperator's "statements were simply words of advice and generalized offers of help."). His comment that the petitioner's plan to plant drugs in Williams's car "really wouldn't make the problem go away" (ECF No. 6-11 at 31), was not the same as urging her to have Williams killed.[11]

The petitioner also claims that Occhino's agreement to accept a $500 deposit was the equivalent of pushing her to ask that Occhino kill her husband. (ECF No. 1 at ¶ 49.) But Occhino's agreement to take less money "merely afforded [the petitioner] an opportunity to commit the offense," "which standing alone is insufficient to warrant an entrapment charge."

---

[11] The petitioner also says that LaBella told her "about the gasoline tank and this and that and putting a hole in it," comments to which the petitioner referred in her final meeting with Occhino (ECF No. 1 at 64); the petitioner claims this proves that LaBella actively induced her to kill her husband (*id.* at ¶ 44). As noted earlier, LaBella was not a "public servant" for purposes of the affirmative defense of entrapment. In any event, LaBella's suggestions of possible ways to kill Williams is not evidence that he convinced the petitioner to kill her husband when she was not otherwise disposed to do so.

13

*Brown*, 82 N.Y.2d at 872; *see also Vega*, 258 F. App'x at 359 ("[T]he fact that government agents merely afford opportunities or facilities for the commission of the offense does not constitute entrapment. Entrapment occurs only when the criminal conduct was the product of the creative activity of law-enforcement officials."). Moreover, as explained above, Occhino did not pressure the petitioner to make a particular choice; on the contrary, he offered her multiple chances to "walk away." (*See, e.g.,* ECF No. 1 at 69, 75, 85.)

In short, there is no reasonable view of the evidence that the petitioner was not predisposed to hire a hitman to kill her husband. She "needed no persuasion to engage in criminal activity." *People v. Stroud*, 190 A.D.3d 592, 594 (1st Dep't 2021). Her words and actions demonstrate her motivation to kill her husband. She was eager to move forward with the plot, and expressed no remorse or uncertainty. Accordingly, the trial court's refusal to give the charge was not error.[12]

## CONCLUSION

Accordingly, the petition for a writ of habeas corpus is denied and the case is dismissed. A certificate of appealability will not be issued. See 28 U.S.C. § 2253(c). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of Court is respectfully directed to enter judgment and close this case.

---

[12] Since the petitioner was not entitled to an entrapment charge, I do not address the second and third *Davis* questions.

**SO ORDERED.**

                                                  s/Ann M. Donnelly
                                        ANN M. DONNELLY
                                        United States District Judge

Dated:  Brooklyn, New York
          September 15, 2021